This is an appeal from the judgment of the District Court of Arizona following a jury trial. We've raised four issues here. Confrontation issue, the issue having to do with the admission of drug courier profile evidence, drug profile evidence, the issue with respect to the prosecutor's closing argument, and the issue with respect to the prosecution's closing argument. The issue with respect to the confrontation and admission of hearsay evidence deals with three separate pieces of evidence, two of which no objection was made. And I'll concede that right now. The first was the evidence admitted from a Customs Service supervisor on the sighting of the plane coming overhead near Arabaca, Arizona, in southern Arizona. That was evidence that was admitted without objection. The second piece of evidence is the testimony by Officers Stevens and Ruiz on their interviews with alleged co-conspirators Avalos and Lewis. Avalos and Lewis were stopped by Stevens and Ruiz shortly after the plane had been spotted in the area around Baus, Arizona. Let me go to your first issue. Isn't it true that in defense, I don't know if you were defense counsel. I was not. All right. Well, defense counsel's closing argument acknowledged the material fact that a plane matching that description was detected in the area that evening. Wasn't Horan's testimony simply meant to explain his subsequent actions? Absolutely. I agree with that. The problem is admission of the testimony of the Customs supervisor goes to the point of whether there was importation into this country because the Customs supervisor was down near the border. The admission that there was a plane does not admit that there was importation. It admits that there was a plane that came in. The location from where that plane came is not an issue if there's simply discussion by the in-closing argument that there was a plane. There's no question there was a plane. The question is where that plane came from. All right. The importance of the Stevens and Ruiz testimony was that, number one, the government was allowed to get into evidence statements by these alleged co-conspirators, Avalos and Lewis, first concerning what the government claimed was a false exculpatory statement that they had been near a picnic and borrowed the truck from a friend that they were stopped in. The second one was even more significant because the question asked of Ruiz was, what did you learn after talking to Avalos and Lewis? We learned that we had investigative leads, Walt and Frank, which, of course, pointed directly to Walt Mickelson, who was an alleged co-conspirator who testified for the government, and Frank Francisco Padilla. The final piece of evidence that was admitted, hearsay evidence that was admitted, there was objection to this. This came from the testimony of Mr. Dickerson, I believe it was, concerning the interview with Terry Padilla. Terry Padilla and Mary Gann had been stopped late in the night after the plane had been spotted, late or early in the morning hours, leaving the Padilla residence, and Terry Padilla was questioned at length. The court permitted this questioning to take place with repeated questions that implied what the answers were, like, where is your husband, what vehicle, then the next question being, what vehicle did he leave in? So it implied that there was an answer, he left in a vehicle, and there was a series of questions. Objections were raised to all of those questions, but the testimony was admitted. The government claims that this testimony was simply admitted as background evidence. I would submit that that is not borne out by the record, because the government's closing argument, which I quoted in the reply brief, repeatedly refers to this evidence as, quote, corroborating evidence. It refers to the customs supervisor's testimony concerning what had happened down by the border. It refers to Stevenson's agent, or Officer Stevenson Ruiz's testimony as well. The false, what the government claimed was a false exculpatory statement, and the government getting the names of Walt and Frank. But let me ask, on that testimony, even if there was a problem, wasn't it cumulative with respect to, for example, the location? You know, that Padilla was not at home, and some of that evidence. Wasn't that just cumulative of other things, like Mickelson's? Well, Mickelson was an accomplice, and what the prosecutor was arguing was, you don't have to believe the accomplice testimony because of, obviously, the instruction that accomplice testimony is to be considered with great care. The prosecutor was arguing that this evidence corroborated Mickelson's testimony, and therefore was important evidence for the jury to consider in deciding the case. And one point I would make on the harmless error argument, there was a previous trial in this case. It ended in a hung jury. So at least one previous jury had some difficulty with Walter Mickelson's testimony, and perhaps Mary Gann's testimony, his wife's testimony as well. In this case, the prosecutor argued that the corroborating evidence, which was the hearsay evidence, supported Mickelson in the case. Let me just address the Carter v. Kentucky issue briefly. There's no question in this case there was a request, a written instruction was submitted, that no adverse inference be taken from the defendant's failure to testify. There's no question the district court failed to give that instruction. Didn't the district court give a subsequent jury instruction? That's correct. The district court did give general instructions on presumption of innocence and burden of proof, but did not give a specific instruction on no adverse inference from the defendant's failure to testify, which in Carter v. Kentucky the Supreme Court held is necessary and is not covered by the ‑‑ Well, you cited to the Perlaza case, which seems clearly distinguishable from this case, because in that case the prosecutor's comment was intentional and the judge didn't respond at all. But here the judge sustained the objection and then gave final injury. Well, that has to do with the prosecutor's comment in closing argument that the presumption of innocence no longer applies. They're related. Carter v. Kentucky talks about them being related. But what I'm pointing out is the Carter v. Kentucky issue, that if a defendant asks for a no adverse inference instruction, the defendant is entitled to have it given. The court didn't give it in this case. There was a little bit of an odd chronology, though, and that is they ask for it, then they get to the end and the judge says I'm going to basically give these instructions from the first trial. And are there any other instructions you wish? And then counsel says no, Your Honor. So ‑‑ Well ‑‑ So is it kind of odd? I mean, is a judge at that point supposed to say, oh, didn't you request something earlier? Isn't that the lawyer's job? Well, obviously it would have been better if the lawyer would have said something at that point. But the lawyer had ‑‑ More than better. They had had an earlier discussion about it. Now, we don't know whether something was said at that earlier discussion that was not on the record because the transcript you're citing simply recites that they had an earlier discussion and then recites the ‑‑ Right. The colloquy between the lawyers and Judge Rosenblatt. But the significant point is there was a written instruction that was submitted prior to trial which complies with Rule 30. And obviously if the court had said this is what I'm going to do, I'm going to give the instructions I gave previously, there wouldn't have been a whole lot of point in arguing something beyond that because the court had already decided it. Well, but ‑‑ I'm not going to quibble with you, but you're sitting there with a pile of instructions saying I'm going to give these instructions. Does anybody have any objection? It seems that the lawyer ‑‑ I mean, these are the instructions. So there's no ‑‑ I can't see how the lawyer is going to presume something else is going to be added to those instructions. There's no support for the notion, no case support for the notion that the lawyer would have to do something else at that point as long as the lawyer had submitted the instructions in compliance with Rule 30 as written instructions in advance. Thank you. You're welcome. Good morning. May it please the Court. Joan Rufinock appearing on behalf of the United States. Could you speak up a little more into the microphone? Thank you. Yes. Is that better? I'll take the second issue first with the Court's consent. With regard to the adverse inference instruction, the government submits that an instruction was in fact given. If you look at the chronology of what happened, on December 4th, the defense requested the instruction. On December 8th, they had ‑‑ I'm sorry. On December 4th, they ‑‑ the instructions were submitted. On December 4th, the district court in preliminary instructions to the sworn jury panel that heard the case, they were instructed that since the defendant has the right to remain silent, the law prohibits you in arriving at your verdict from considering that the defendant may not have testified. The government must prove the defendant's guilt beyond a reasonable doubt. That is the sum and substance of the instruction that was requested by the defendant pretrial. The real question is, is there some obligation to duplicate that in the final instruction? Exactly. And this Court has said that a jury is presumed to follow its instructions, and there is no need to give cumulative or duplicative instructions. And therefore, the government submits that since it was this sworn jury panel that was advised of that prior to the taking of the evidence, that it was so instructed in compliance with Carter v. Kentucky, and therefore, there was no error. With regard to the hearsay or the alleged hearsay evidence, the government submits that the testimony by Agent Heron was that he received information that there was a ‑‑ let me back up. Preliminary to him testifying with regard to the challenge statements, Agent Heron was that there were particular routes that the job of customs at the time was to patrol the borders and to determine whether there was any clandestine activity of smuggling coming in, particularly air smuggling. He was in the radar unit, so he was particularly focused on radar. And he testified that there were particular routes that air smugglers were using at the time to bring drugs from south of the border into particularly Arizona. And he identified where those locations were. After that testimony, that preliminary testimony, he testified that on the 7th of November that he had received information and alerts, because he said that there was an alert system set up, that pursuant to that alert system, he was notified that there was a plane that appeared to have passed ‑‑ that was noted in the area of the Mexican border that was flying without lights on, and it appeared that the agent or the customs agent at the border had heard it. As a result of that phone call, Heron testified that he immediately swung his radar over to that area and within a short period of time picked up what he believed to be the suspected target. So the government submits that that was preliminary testimony to why he did what he did, which was focus in on that area to see if he could find anything that might fit the target. He testified that as a result of turning the radar to that area, he detected a plane flying in a restricted area that was within that suspected drug corridor, that he tracked that plane for the next 45 minutes, that he sent up another plane to intercept the target plane to determine whether or not it was carrying contraband or was in fact legitimate traffic. He also testified that he surveyed the local airports in the Arizona area to determine whether or not that suspect plane had declared itself, found that it had not. And then you've got the further testimony with regard to the actions of that plane prior to its landing and offloading the 1,400 pounds of marijuana. Government submits that it wasn't the statement that he received an alert that there was a suspect plane that was incriminating evidence. That was a statement that gave background to Agent Herron's testimony as to why he did what he did. With regard to the statements that were made by Officers Stevens and Ruiz with regard to Walt and Frank being investigative leads, the government submits that that was cumulative evidence of other evidence that came in. And in any event, to the extent that the statement Walt may have been hearsay, it was not incriminating with regard to the defendant, because it was simply that the name Walt was on the back of one of the person's belts, and therefore the person believed, either Avalos or Ruiz, believed that Walt may have been involved. And that caused the investigation into who Walt may be. But the government submits that any evidence or that at that point the evidence was incriminating of Walt, not of the defendant, and that further investigation from the fact that the registration paperwork was taken from the truck, the registration paperwork indicated that it was Francisco Padilla that was the registered owner of the truck. That caused the agents to send others to the location of the home where the truck was registered to. It was at that point that the defendant's wife, Terry Padilla, and Walt's wife, Mary Gann, were encountered at the Padilla residence and were asked questions by Officer Dickerson. So the government submits again that the information Walt and Frank, to the extent it was or may have been hearsay, it was harmless hearsay in light of the other evidence that came in. And while defense argues that the United States improperly argued that in closing, the government submits that if the court closely looks at what, in fact, the prosecutor argued, particularly with regard to the citing by the customs officer and by statements made by Avalos and Ruiz, you'll see that it was not improperly argued because what the government did was say the plane was cited, it was cited by a customs officer, and then the following three pages, which are not contained in page five of the reply brief, go on to detail all the testimony of Agent Heron and as to what Agent Heron did that tracked that plane. And with regard to Avalos and Ruiz, while saying that the people were interviewed, Avalos and Ruiz, the government immediately then said, and what did the vehicle contain, ladies and gentlemen, the vehicle contained the evidence of the drug smuggling activity, which was the statement to implicate the defendant as far as or inferring that what it was, that what they were told by Avalos and Ruiz is what incriminated the defendant. Rather, it was Avalos and Ruiz gave these false statements about or this false story about, oh, we were at the lake, we were having a picnic, I'm just driving, taking this truck, friend of a friend's truck to drive him to Blythe, California, when, in fact, there was no lake, there was no picnic, that that was a lie and that they were lying and they had all this evidence of drug importation and smuggling in the truck. And it was those things that were argued to support Walter Mickelson's testimony, not the fact that Avalos or Ruiz mentioned Walton Frank. With regard to Dickerson's statement, one thing that the defense leaves out is the fact that Mr. Dickerson, in fact, testified and he was subject to cross-examination. And it's also part of the record that those statements or those questions, when he testified to the questions that he asked of Mrs. Padilla, that the reason that he did that was to get the reaction of Mrs. Padilla. And Mrs. Padilla, in fact, was nervous, evasive, and didn't want to answer questions. But, again, that evidence is also cumulative of evidence that was introduced to the testimony of Mary Gann, which has not been challenged in this appeal. Because, as the court knows, Mary Gann testified that she was in that vehicle, that they were stopped by the police, that they were both nervous, that they had gotten the phone call from Defendant Padilla saying, we're in trouble, come get us. And it was in the middle of the night. Again, all of this, the circumstances of Dickerson's testimony corroborates both Mickelson and Gann and, therefore, shouldn't be found to be error. If the Court has no further questions, we'll submit the remaining issues on the brief. Thank you. Can I just briefly respond? Yes, you may. With respect to the Carter v. Kentucky issue, let me just point out that this Court in United States v. Soto, 519-539-27, dealt with a situation where there was a pretrial instruction not to draw no adverse presumption. That had been given at the time of voir dire of the jury, previous to the selection of the jury. The Court found it insufficient. In fact, Judge Gould concurring said, nothing in the Supreme Court precedent suggests that a judge's constitutional obligation to warn the jury not to give evidentiary weight to a defendant's failure to testify can be met through statements during voir dire, rather than to a jury instruction when requested at the close of the trial. So the Supreme Court has never held that an instruction pre-trial, an instruction prior to a jury instruction, prior to the trial beginning, would be sufficient to meet the Carter v. Kentucky requirement. Don't you see a difference between a jury pool and a jury, though? Not really. It's given at the same time. Are they yet sworn when they are a jury pool? Well, no. They're sworn to tell the truth in response to voir dire. But it seems to me it's going to be the difference that we may  And in fact, it's the same instruction given when the jury is asked upon a jury, it seems to me. An instruction not to draw no adverse presumption during voir dire is virtually the same, I would submit, than an instruction given after selection and at the beginning of the case. It's the same instruction given when the jury is asked upon a jury, it seems to me, than an instruction given after selection   after selection and at the beginning of the case. We'll take Soto. Let me just say, I'm looking at the Soto case, and didn't they find in that case that it was harmless error? That's correct, Your Honor. Why would that be true in this case? Because there's a difference between this case. Remember, Walter Mickelson was testifying under an agreement with the government that he wouldn't be prosecuted. His wife, pretty much the same thing. In that case, in Soto, the jury acquitted the defendant on the charges involving the cooperating witness, the distribution charges that the cooperating witness had testified about, and convicted the defendant only on the possession charges based upon the search warrant that was executed in the case. So the Court could come to the conclusion that the jury didn't give undue weight to the defendant's failure to testify because they had rejected the testimony of the cooperating witness on the distribution charges. There's no similar situation here. I understand your argument. Thank you. Thank you. The case just argued is submitted, United States v. Padilla.
judges: Hug, Nelson D. W., McKeown